# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARIBE MEDIA, INC., et al.,[1] | ) | Case No. 11-11387 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DECLARATION OF CHRIS BATSON, THE DEBTORS'
## CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST DAY MOTIONS

I, Chris Batson, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of CII Acquisition Holding Inc. ("CII") and Caribe Media, Inc. ("CMI"), each a corporation organized under the laws of Puerto Rico and a debtor and debtor in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases. I have been the Debtors' Chief Financial Officer since February 2011 and served as the Debtors' Vice President and Treasurer from May 2010 through February 2011. As a result of serving in such capacities, I am generally familiar with the Debtors' day-to-day operations, businesses and financial affairs, and books and records.

2.      Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information

---

[1]  The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are:  Local Insight Media Holdings, Inc. (2696); Local Insight Media Holdings II, Inc. (8133); Local Insight Media Holdings III, Inc. (8134); LIM Finance Holdings, Inc. (8135); LIM Finance, Inc. (8136); LIM Finance II, Inc. (5380); Local Insight Regatta Holdings, Inc. (6735); The Berry Company LLC (7899); Local Insight Listing Management, Inc. (7524); Regatta Investor Holdings, Inc. (8137); Regatta Investor Holdings II, Inc. (8138); Regatta Investor LLC; Regatta Split-off I LLC; Regatta Split-off II LLC; Regatta Split-off III LLC; Regatta Holding I, L.P.; Regatta Holding II, L.P.; Regatta Holding III, L.P.; Caribe Media, Inc. (9005) and CII Acquisition Holding Inc.  For the purpose of these chapter 11 cases, the service address for all Debtors is:  188 Inverness Drive West, Suite 800, Englewood, CO 80112.

gathered from my review of relevant documents, and information supplied to me by other members of the Debtors' management and advisors. I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

3.     To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested a variety of relief in "first day" motions, and applications (each, a "First Day Motion," and collectively, the "First Day Motions") filed concurrently herewith. I am familiar with the contents of each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. I further believe that the relief requested in the First Day Motions will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates, and will assist the Debtors in achieving a successful reorganization.

4.     To assist the Court in becoming familiar with the Debtors and the initial relief they seek to stabilize operations during this restructuring, this declaration is organized as follows:  (a) Part I provides a preliminary overview; (b) Part II provides a summary of the Debtors' corporate history, capital structure, and business operations, as well as an overview of the circumstances and events leading to the filing of these chapter 11 cases; and (c) Part III provides an overview of the relief the Debtors seek at the first two hearings in these chapter 11 cases.

## I.    Preliminary Overview[2]

5.    The Debtors and their direct and indirect non-Debtor subsidiaries (collectively, "Caribe") -- the silo on the far left of the organizational structure chart attached hereto as **Exhibit A** -- own the publication rights for certain print and internet directories in the Dominican Republic and Puerto Rico.  Specifically, Debtor CII's wholly-owned subsidiary, Debtor CMI, owns 60% of the equity interests of non-Debtor subsidiary Axesa Servicios de Información, S. en C. ("Axesa") and 100% of the equity interests in Caribe Servicios de Información Dominicana, S.A. ("CSID").[3]  Axesa and CSID are the Debtors' main operating subsidiaries.  Axesa is the leading Yellow Pages publisher in Puerto Rico and the official publisher for Puerto Rico Telephone Company, Inc. ("PRTC"), the largest local exchange carrier in Puerto Rico.  With the exclusive right to publish directories under the PRTC brand through year 2094 and an approximately 80% market share, Axesa manages approximately 18 print publications, seven digital products, and approximately 7,300 advertising customers.  Axesa prints and circulates approximately 3.2 million directories per year in Puerto Rico.

6.    CSID is the official publisher for Codetel, the largest telecommunications provider in the Dominican Republic, with the exclusive right to publish under the Codetel brand through year 2036 and an approximately 98% market share.  CSID is the largest directory publisher in the Dominican Republic with approximately 15 print publications, four digital products and approximately 34,000 advertising customers.  CSID prints and circulates

---

[2]    Prior to the commencement of these chapter 11 cases, on November 17, 2010, 18 of the Debtors' affiliates (the "Local Insight Debtors") commenced chapter 11 cases that are currently pending and being jointly administered by this Court under the case styled, *In re Local Insight Media Holdings, Inc., et al.*, Case No. 10-13677 (KG) (the "Local Insight Chapter 11 Cases").  For background regarding the Local Insight Chapter 11 Cases, see the *Declaration of Richard C. Jenkins, the Debtors' Interim Chief Financial Officer, in Support of First Day Motions* [Docket No. 13], filed in the Local Insight Chapter 11 Cases on November 17, 2010.

[3]    Third-party Truvo Belgium Comm. V owns the remaining 40% equity interest in Axesa.

approximately 1.7 million directories per year in the Dominican Republic. CSID also provides certain essential back-office support and other services to Axesa and certain of the Local Insight Debtors.

## II.    Corporate History, Capital Structure, and Business Operations

### A.    Corporate History

7.     Debtors CII and CMI (as successor to CII Acquisition Corp. ("CII Acquisition")) were formed on or about November 16, 2005. At that time, CII was wholly-owned by Caribe Acquisition Holdings, LLC, a predecessor to non-Debtor affiliate Local Insight Media, L.P.

8.     On or about February 28, 2006, CII Acquisition entered into a share purchase agreement whereby CII Acquisition agreed to purchase 100% ownership of Verizon Servicios de Informacion Dominicana, S.A., now known as non-Debtor subsidiary CSID, and 60% ownership of Caribe Information Investments, Inc. ("CIII"). At that time, CIII owned a 60% interest in Verizon Information Services – Puerto Rico Inc., S. en. C. ("VISPR"), now known as non-Debtor subsidiary Axesa. The transactions contemplated under this share purchase agreement closed on March 31, 2006.

9.     Also on February 28, 2006, CII Acquisition entered into a share and publication rights purchase agreement whereby CII Acquisition agreed to purchase, among other things, the remaining 40% of CIII's outstanding and issued common shares. Also under this agreement, CII Acquisition agreed to purchase from PRTC its right to receive 35% of Axesa's collected revenue from its core directories. The transactions contemplated under this share and publication rights purchase agreement closed on March 31, 2006.

10.     CII Acquisition merged into CIII and was renamed Caribe Media, Inc. on March 31, 2006. On or about June 20, 2008, CII became an indirect, wholly-owned subsidiary of non-

4

Debtor affiliate Local Insight Media Holdings, L.P. Then, on or about May 4, 2009, CII became a wholly-owned subsidiary of Local Insight Media Holdings, III Inc., a Local Insight Debtor.

## B.    Capital Structure

11.    Debtor CII owns 100% of the equity of Debtor CMI. CMI's approximately $184 million of funded debt was raised in connection with the transactions described in paragraphs 8 and 9 above. As explained below, CMI's funded debt includes a senior secured credit facility in the approximate amount of $127 million that consists of term loans in the approximate amount of $120 million due March 31, 2013 and a revolver in the approximate amount of $7 million due March 31, 2012, as well as senior subordinated notes in the approximate amount of $57 million due March 31, 2014. With the exception of claims on account of the Senior Subordinated Notes or claims maintained by the Debtors' insiders, as of the Petition Date, neither of the Debtors have any outstanding, unsecured, prepetition debt.

### 1.    Senior Secured Credit Facility

12.    On March 31, 2006, CII and CMI (as successor to CII Acquisition), as borrower, entered into that certain $165,000,000 Credit Agreement with Lehman Brothers Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners, Bank of America, N.A., as syndication agent, Wachovia Bank, National Association, as documentation agent, Cantor Fitzgerald Securities ("Cantor" or the "Agent"), as administrative agent,[4] and the several lenders (the "Senior Secured Prepetition Lenders") from time to time parties thereto (as amended, modified and supplemented from time to time, the "Senior Secured Credit Facility"). At issuance, the Senior Secured Credit Facility consisted of term loans in the aggregate amount of

---

[4]    Pursuant to that certain Resignation, Waiver, Consent, Amendment and Appointment Agreement, dated on or about April 4, 2011, by and among CMI, certain CMI affiliates as guarantors, Cantor, in its capacity as successor agent, Lehman Commercial Paper Inc. ("Lehman") and each of the lenders signatory thereto, Cantor succeeded Lehman as administrative agent under the Senior Secured Credit Facility.

5

$155 million and revolving credit loans, including swing line loans and letters of credit, in the aggregate amount of $10 million.

13.     The Senior Secured Credit Facility is guaranteed in accordance with that certain Guarantee and Collateral Agreement (the "Guarantee Agreement"), dated as of March 31, 2006, by and among CII, CMI (as successor to CII Acquisition), and certain of its subsidiaries in favor of Cantor (as successor to Lehman). Under the Guarantee Agreement, CII, CMI and non-Debtor subsidiaries Caribe Dominicana I, LLC, Caribe Dominicana II, LLC, Caribe Dominicana III, LLC, Caribe Dominicana IV, LLC, Caribe Dominicana V, LLC, and Caribe Dominicana VI, LLC (collectively, "Caribe Dominicana"), and CSID guaranteed the obligations under the Senior Secured Credit Facility.

14.     Obligations under the Senior Secured Credit Facility are secured pursuant to (a) that certain Collateral Agreement (the "CMI Collateral Agreement"), dated as of March 31, 2006, by and among CMI (as successor to CII Acquisition), and certain of its subsidiaries in favor of Cantor, as administrative agent (as successor to Lehman) and (b) that certain Collateral Agreement (the "CII Collateral Agreement," and together with the CMI Collateral Agreement, the "Collateral Agreements"), dated as of March 31, 2006, by and among CII, CMI (as successor to CII Acquisition), and certain of its subsidiaries in favor of Cantor, as administrative agent (as successor to Lehman). The grantors under each of the Collateral Agreements granted to Cantor a valid, perfected, first priority security interest in each such entity's Collateral (as defined in the Collateral Agreements), which includes then-existing and after-acquired accounts, chattel paper, contracts, documents, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter of credit rights, goods, and other property, books and records, and insurance policies. Specifically, under the CMI Collateral Agreement, CMI and

6

CSID granted all of the issued and outstanding shares, stock certificates, options, or rights of any nature in CSID to Cantor. Under the CII Collateral Agreement, CII and CMI granted all of their shares, stock certificates, options, or rights of any nature in CMI to Cantor.

15. As of the Petition Date, the Debtors owe approximately $127 million under the Senior Secured Credit Facility, of which approximately $120 million is due on account of principal under the term loan component, and approximately $7 million is due on account of principal under the revolver component.

## 2. Senior Subordinated Notes

16. In addition to the Senior Secured Credit Facility, on March 31, 2006, CMI (as successor to CII Acquisition) and WCAS Capital Partners IV, L.P.[5] (the "Senior Secured Noteholder") entered into that certain Senior Subordinated Notes Purchase Agreement, pursuant to which CMI issued $45 million in senior subordinated notes to WCAS Capital Partners IV, L.P. with a maturity date of March 31, 2014 (the "Senior Subordinated Notes").[6] In connection with the issuance of these notes, the noteholders, CMI, and Cantor, as administrative agent under the Senior Secured Credit Facility (as successor to Lehman), entered in that certain Subordinated Note Intercreditor and Subordination Agreement (the "Intercreditor and Subordination Agreement"), dated March 31, 2006. Under the Intercreditor and Subordination Agreement, the Senior Subordinated Notes are subordinate and junior in right of payment to the obligations under the Senior Secured Credit Facility.

---

[5]    WCAS Capital Partners IV, L.P. is an affiliate of Welsh, Carson, Anderson & Stowe, which owns 100% of the equity interests in Debtor CII.

[6]    Pursuant to a letter agreement from the Senior Subordinated Noteholder, dated May 29, 2009, the Senior Subordinated Noteholder agreed, pursuant to section 3.01(b)(ii) of the Senior Subordinated Notes Purchase Agreement, to convert all accrued interest due and payable under the Senior Subordinated Notes starting on October 1, 2009 from 10% cash interest to 12% PIK interest.

17.     As of the Petition Date, CMI owes approximately $57 million on account of principal due under the Senior Subordinated Notes.

### C.     Business Operations

#### 1.     Axesa's Operations

18.     Axesa is the exclusive publisher of PRTC-branded directories and the largest publisher of print and Internet Yellow Pages ("IYP") in Puerto Rico. Axesa's product portfolio comprises a variety of print, voice, and online offerings, including: (a) two local regional directories -- "Tu Guía Comercial Local Bayamón" and "Tu Guía Comercial Local Carolina"; (b) a mobile directory -- "Guía Móvil"; (c) a business-to-business directory -- "The Business Register"; (d) an export and import guide; (e) a tourist magazine -- "Places to Go"; and (f) two membership directories -- "Puerto Rico Chamber of Commerce" and the "Puerto Rico Hotel & Tourism Association." Axesa also provides information services through Operator Assisted Yellow Pages, Infovoz 511, and SuperPagesPR.com, an online yellow pages service that provides consumers with information about products and service suppliers in Puerto Rico.

#### 2.     CSID's Operations

19.     CSID is the exclusive publisher of Codetel-branded directories and the largest publisher of print and IYP directories in the Dominican Republic. CSID publishes the following print directories: (a) two directories for Santo Domingo -- "Directorio Comercial" (Yellow & White Pages) and "Directorio Residencial" (White Pages only); (b) three regional directories for "Norte", "Sur" and "Este" Regions (Yellow and White Pages); (c) a business-to-business directory -- "The Business Register"; (d) the official tourist guide of the Dominican Republic -- "Guía Turística de la República Domincana"; (e) two chambers of commerce associations private directories -- "Directorio de la Cámara Americana de Comercio" and "Cámaras de

8

Comercio y Producción de la Región Norte"; (f) a health services and products directory -- "Guía de La Salud"; and (g) a mobile directory -- "Guía Móvil". CSID is also the exclusive provider of the Dominican Republic's phone listings database, as well as the official provider of the online phone listings through paginasamarillas.com.do.

### D. Debtors' Business Relationships with the Local Insight Debtors

20.     Under that certain Master Services Agreement (together with any and all related documents, the "Axesa-Berry Agreement"), dated as of July 15, 2009, by and between Axesa and The Berry Company LLC ("Berry"), a Local Insight Debtor, Axesa outsources to Berry certain services in connection with the production and publication of its print directories.  In exchange for Berry's services, Axesa pays Berry 4% of Axesa's total revenue for the immediately preceding calendar year, subject to certain conditions.  Specifically, under the Axesa-Berry Agreement, Berry provides Axesa with graphics, data entry, customer contact, receivables collection, information technology, quality control, and payroll services.  Axesa's engagement of Berry under the agreement is non-exclusive and does not limit Axesa's right to engage its own employees and third parties to provide those services provided by Berry.

21.     On or about July 15, 2009, Berry entered into that certain Subcontract Agreement (the "Subcontract Agreement") with CSID, whereby Berry subcontracted certain of its production and publication obligations under the Axesa-Berry Agreement to CSID.  In addition, pursuant to that certain Master Services Agreement between Berry and CSID (together with any and all related documents, the "Berry-CSID Agreement"), effective January 4, 2010, Berry outsources to CSID production and publication obligations unrelated to the Axesa-Berry Agreement, which includes (a) maintaining, updating, and changing Berry's rate tables to price Berry products, (b) allocating certain sales responsibilities to CSID sales representatives,

9

(c) order processing, white pages listings processing, and contact management, and (d) graphics, information technology, pagination, and other services. For services that CSID performs under both the Subcontract Agreement and the Berry-CSID Agreement, Berry pays CSID 110% of CSID's fully burdened costs, which, in the aggregate, is estimated to total approximately $7 million for fiscal year 2011.

22.     Finally, under that certain Amended and Restated Management Services Agreement (the "Management Services Agreement"), dated as of January 1, 2009, by and between CMI and non-Debtor affiliate Local Insight Media, Inc. ("LIMI"), LIMI provides CMI with certain management consulting services. Specifically, under the Management Services Agreement, LIMI management, among other things, consults with Axesa and CSID employees on topics (including general corporate and strategic matters), provides assistance with the operation of accounting, legal, risk management, internal auditing, and tax departments, provides analysis of market trends and competitors, advises on investment projects, assists with advertising implementation, investor relations activities, and other communications tasks, and provides human resource support. In exchange for these services, CMI pays LIMI 110% of LIMI's fully burdened costs in providing the management consulting services, which totaled approximately $3.5 million in the aggregate over the past two years.

E.      **Business Performance**

23.     Caribe's total revenues for the two months ended February 28, 2011 and February 28, 2010 were approximately $16 million and $16.8 million, respectively, representing a decline in total revenue of approximately 5% from 2010 to 2011. Caribe's decline in total revenue is primarily attributable to an increase in claims and adjustments and bad debts at Axesa. Specifically, in September 2010, Axesa recorded a bad debt write-off of approximately $4.6

10

million. In addition, Axesa's customer base was alienated due to several directory "long-life" decisions, whereby the publication life of certain Axesa directories was extended from the typical 12-month period to a longer publication life that spanned between 15 and 17 months.

24.     Furthermore, Caribe was negatively impacting by declining consumer usage of print Yellow Pages directories in Puerto Rico and a significant reduction in Axesa's advertiser base compared to prior years. This decline in Axesa's advertiser base is attributable to a number of factors, including increased usage of internet-based local search products other than Axesa's IYP directory (particularly in business-to-business and retail categories) and the global economic recession. Moreover, Puerto Rico's economy has experienced negative GDP growth over the past two years, which was accompanied by inflation.

25.     In contrast to Axesa, usage of CSID's print directories increased over the five-year period ending December 31, 2010, as did its advertiser base. These increases were on account of, among other things, CSID's integration of sales and marketing practices, prioritization of sales-directed program prospects, and implementation of sponsorship and retention programs. And, while Axesa's digital offerings have seen a 9% decline in visitors year-over-year, CSID's strong digital offerings have mitigated the decline in CMI's print revenue. CSID's digital revenues increased 70% to approximately $7.6 million in 2010 compared to results for 2009. Overall CSID's total revenue for 2010 was $45 million, which represents a 15% increase from 2009 to 2010.

**F.     Competition**

26.     Considering CSID's 98% share of the print directory publishing market in the Dominican Republic and its relationship with Codetel, the largest telecommunications company in the Dominican Republic, CSID's competition in the Dominican Republic's directory

11

publishing market is minimal. Conversely, while Axesa holds an approximately 80% share of the print directory publishing market in Puerto Rico, competition has materially increased since the beginning of 2009 when Infopaginas entered into the print directory publishing market. Specifically, Infopaginas is partially owned by the largest newspaper in Puerto Rico and consistently appears in full color advertisements in that newspaper. Infopaginas continues to aggressively market its directory services, and offers customers incentives and high quality services at lower prices.

28. In addition, while CSID maintains a strong digital presence in the Dominican Republic, the Debtors' overall print and digital advertising offerings have come under increasing competition from electronic directories, search engines, and portals such as Google™, Yahoo!™, and Bing™, which each provide access to local search information.

## G.    Events Leading to the Chapter 11 Cases

28. As a consequence of the performance issues discussed above, in November 2010, CMI reported that it breached the total and secured leverage covenants under the Senior Secured Credit Facility for the third quarter 2010. Given these defaults, CMI undertook efforts to engage in discussions and negotiations with counsel and advisors for an *ad hoc* committee of Senior Secured Prepetition Lenders (the "Ad Hoc Committee"). Those discussions initially focused on the Senior Secured Prepetition Lenders' forbearance from exercising rights on account of CMI's covenant defaults, but evolved into negotiations regarding a comprehensive restructuring of the Senior Secured Credit Facility.

29. During the course of these discussions and negotiations, the Ad Hoc Committee raised issues regarding approximately $44.2 million in dividend payments that CMI transferred to non-Debtor affiliate LIMI between May 4, 2009 and September 2010 (the "Dividend

12

Payments"). The Ad Hoc Committee informed the Debtors that they believed the Dividend Payments were improper and potentially subject to avoidance under either federal or state fraudulent conveyance laws. In connection therewith, Cantor filed numerous proofs of claim in the Local Insight Chapter 11 Cases against certain Local Insight Debtors believed to be subsequent transferees of the Dividend Payments. Axesa and CSID filed similar proofs of claim.[7]

30. Further, the Ad Hoc Committee insisted that the Debtors commence these chapter 11 cases on or before May 3, 2011 to preserve their purported fraudulent conveyance causes of action. The Ad Hoc Committee also stated that it would exercise certain rights under the Senior Secured Credit Facility and the Collateral Agreements in the event that the Debtors did not commence these chapter 11 cases on before May 3, 2011 in order to preserve these claims. Consistent with these statements, on April 27, 2011, CMI received from Cantor a *Notice of Acceleration* stating that certain Events of Default (as defined in the Senior Secured Credit Facility) had occurred and remained uncured, and a result thereof, Cantor, among other things, terminated the Revolving Credit Commitments (as defined in the Senior Secured Credit Facility) and declared all loans under the Senior Secured Credit Facility to be immediately due and payable. The following day, CMI received from Cantor a *Notice of Intent to Exercise Rights Under Collateral Agreement*, whereby Cantor provided notice of its intent to exercise remedies under section 5.3(b) of the CII Collateral Agreement on or before 12:00 p.m. (ET) on May 3, 2011, which includes the right to register the Pledged Securities (as defined in the CII Collateral Agreement) in the name of Cantor or its nominee and vote the Pledged Securities. Partially in

---

[7]  The Debtors retained the law firm of Curtis, Mallet-Prevost, Colt &Mosle LLP ("Curtis Mallet") to serve as conflicts counsel. Curtis Mallet filed the relevant proofs of claim in the Local Insight Chapter 11 Cases.

DOCS_DE:169744.1

response to this pressure, and to facilitate the Debtors' overall restructuring, the Debtors voluntarily commenced these chapter 11 cases.

31.     To limit the impact that these chapter 11 cases would have on Caribe's operations, the Ad Hoc Committee agreed to not require Axesa or CSID -- CMI's main operating entities -- to file for chapter 11 and, contemporaneously herewith, the Senior Secured Prepetition Lenders agreed to forbear from exercising any rights or causes of action against the Debtors' non-Debtor subsidiaries on account of existing defaults under the Senior Secured Credit Facility.

III.    **Relief Sought in the Debtors' First Day Motions**

32.     The Debtors have filed or will file a number of First Day Motions seeking orders granting various forms of relief. I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

        A.      **Motion of Caribe Media, Inc., et al., for the Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion")**

33.     By the Joint Administration Motion, the Debtors seek entry of an order jointly administering these chapter 11 cases for procedural purposes only. The Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. In addition, given the integrated nature of Debtors' operations, joint administration of the cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Indeed, many of the motions, hearings, and orders that will arise in these chapter 11 cases will affect each Debtor. Thus, the entry of an order directing joint administration will reduce fees and costs by avoiding duplicative filings and objections. Joint

14

administration also will allow the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all parties in interest to monitor the cases with greater ease and efficiency.

34. Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Motion requests only administrative, not substantive, consolidation of the Debtors' estates. In fact, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

35. In light of the foregoing, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Joint Administration Motion.

**B. Motion of Caribe Media, Inc., et al., for the Entry of an Order (A) Authorizing Debtors to Utilize Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties and (C) Scheduling Final Hearing (the "Cash Collateral Motion")**

36. By the Cash Collateral Motion, the Debtors seek the entry of interim and final orders (respectively, the "Interim Order" and "Final Order") that, among other things, (a) authorize the Debtors to use "Cash Collateral" (as defined under Bankruptcy Code section 363) on an interim basis pursuant to sections 361 and 363 of the Bankruptcy Code pending a final hearing on the Motion (the "Final Hearing"), (b) approve the form of adequate protection to be provided to the Senior Secured Prepetition Lenders pursuant to sections 361, 362, 36, and 364 of the Bankruptcy Code; (c) prescribe the form and manner of notice and setting the time for the Final Hearing to consider entry of a final order authorizing the relief provided in the interim order on a permanent basis; and (d) grant related relief.

DOCS_DE:169744.1

37.    The Debtors come before this Court seeking authority to continue to use Cash Collateral based on the following facts:

- The Debtors have more than $1.3 million in unrestricted cash, as of the most recent date prior to the Petition Date for which the Debtors have current numbers.

- As reflected in the Debtors' 26-week cash flow forecast, attached as **Exhibit B** to the Cash Collateral Motion, the Debtors expect to continue to have a positive operational cash flow during the projection period.

- The Debtors' Senior Secured Prepetition Lenders have consented to the Debtors' use of Cash Collateral, on the terms reflected in the Interim Order.

- The Debtors have an immediate postpetition need for the use of Cash Collateral in order to, among other things, continue the operations of their business and the operations of their non-Debtor subsidiaries.

38.    Pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the following summarizes the material terms of the Interim Order:[8]

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral:**<br>(Bankr. R. 4001(b)(1)(B)(i)) | Cantor Fitzgerald Securities, as administrative agent acting on behalf of all other lenders party to the Prepetition Credit Agreement | ¶ (a) |
| **Purpose for Use of Cash Collateral:**<br>(Bankr. R. 4001(b)(1)(ii);<br>Local R. 4001-2(a)(i)) | The Debtors have an immediate need to use the Prepetition Collateral (including but not limited to Cash Collateral), in order to, among other things, preserve the value of the Debtors' businesses and permit the orderly continuation of their businesses.  The Debtors' use of the Prepetition Collateral (including Cash Collateral) is necessary (x) to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the value of their estates and (y) to alleviate any concerns of trade vendors and employees of the Debtors and their operating subsidiaries. | ¶ 5(b) |

---

[8]    The summary of the Interim Order is qualified in all respects by reference to the Interim Order, and to the extent of any inconsistency between the Cash Collateral Motion and the Interim Order, the Interim Order shall govern. Except as otherwise defined in the Cash Collateral Motion, all capitalized terms shall have the meaning ascribed to them in the Interim Order.

DOCS_DE:169744.1

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| **Cross-Collateralization for Secured Creditors** (Local R. 4001-2(a)(i)(A)) | None | n/a |
| **Findings of Validity, Perfection or Amount of Prepetition Liens** (Local R. 4001-2(a)(i)(B)) | <u>Validity and Priority of Prepetition Liens</u>. Subject in all respects to the Carve-Out and any forbearance agreement entered into by and among the Prepetition Agent and certain non-debtor subsidiaries of the Debtors), the Interim Order provides: 1. The Prepetition Credit Parties have granted valid, binding, perfected, enforceable, first priority liens upon and security interests in the the Prepetition Collateral to the Prepetition Agent for the benefit of the Prepetition Secured Parties; 2. The Prepetition Agent's first priority liens upon and security interests in the Prepetition Collateral, for the benefit of the Prepetition Secured Parties, are not subject to avoidance, subordination, recharacterization, recovery, successful attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and 3. Substantially all cash, securities or other property of the Debtors (and the proceeds therefrom) as of the Petition Date, including without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Debtors in any account or accounts are subject to valid, perfected, enforceable, first priority liens under the Prepetition Loan Documents and applicable law, for the benefit of the Prepetition Secured Parties. | ¶¶ 4(iv) - (v) |
| **Provisions Seeking to Waive Rights under 506(c) Without Notice** (Local R. 4001-2(a)(i)(C)) | <u>Section 506(c) and 552(b) Waivers</u>. Subject to and effective upon entry of the Final Order, notwithstanding anything to the contrary contained in the Interim Order, except to the extent of the Carve Out, (a) no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral or the Prepetition Collateral (including the Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Prepetition Agent, as the case may be, (b) no such consent shall be implied from any other action, inaction, or acquiescence by the Prepetition Agent or the other Prepetition Secured Parties and (c) nothing contained in the Interim Order shall be deemed to be a consent by the Prepetition Agent or the other Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral or the Prepetition Collateral (including the Cash Collateral) under section 506(c) of the Bankruptcy Code or otherwise. | ¶ 15 |

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| **Immediate Grants of Claims or Causes of Action Arising Under 11 U.S.C. § § 544, 545, 547, 548 and 549** <br><br> **(Local R. 4001-2(a)(i)(D))** | The Prepetition Agent (for itself and for the benefit of the Prepetition Secured Parties) is granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors, security agreements, pledge agreements, mortgages, financing statements), the Adequate Protection Liens upon all prepetition and postpetition assets and property of the Debtors of any kind or nature whatsoever, now owned or hereafter acquired, and all proceeds of such proceeds, rents, products, and profits, including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of Causes of Action including the Collateral, subject and subordinate only to (y) valid, perfected and enforceable prepetition liens (if any) which are senior to the Prepetition Secured Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy code, and (z) the Carve Out. | ¶ 7(c) |
| **Deeming Prepetition Secured Debt to be Postpetition Debt or Using Postpetition Loans to Pay Prepetition Debt** <br><br> **(Local R. 4001-2(a)(i)(E))** | None | n/a |

18

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| **Carve-Out**<br><br>(Local R. 4001(a)(i)(F)) | "Carve Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, and (ii) after the occurrence and during the continuance of a Termination Event and delivery of the Carve Out Notice, which may be delivered via email, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees incurred after the business day following delivery of the Carve Out Notice and allowed by the Court at any time, in an aggregate amount not exceeding the Carve Out Cap, by Persons or firms retained by the Debtors and the Committee, if any (but excluding fees and expenses of third party professionals employed by such members of the Committee); plus (iv) all unpaid Professional Fees allowed by the Court at any time that were incurred on or prior to the business day following delivery of the Carve Out Notice, whether paid or unpaid prior to such date; provided, that, so long as a Carve Out Notice shall not have been delivered, the Carve Out shall not be reduced by the payment of Professional Fees allowed at any time by the Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code; provided, further that (x) no portion of the Carve Out shall be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation or any threatened litigation against the Prepetition Secured Parties, and (y) nothing in the Interim Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. For the avoidance of doubt and notwithstanding anything to the contrary in the Interim Order or in the Prepetition Loan Documents, the Carve Out shall be senior to the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the Prepetition Obligations granted or recognized as valid, including the claims, liens and security interests granted to the Prepetition Secured Parties. Upon delivery of a Carve Out Notice, prior to making any distributions, the Debtors shall deposit an amount equal to the Professional Fees incurred and unpaid as of such time, plus an amount equal to the Carve Out Cap in the Carve Out Account to be utilized solely for the payment of Professional Fees, and the Prepetition Agent and any Lender (as defined in the Prepetition Credit Agreement) shall not hinder or delay the Debtors' or any other party in interest's compliance with the foregoing deposit requirement, provided, however, that the Debtors depositing such monies into the Carve Out Account shall not impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. The Debtors' deposit of any amount into the Carve Out Account shall not reduce the amount of the Carve Out or the Professionals eligible to be paid therefrom. | ¶ 7(b) |

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| **Adequate Protection**<br><br>**(Bankr. R. 4001(b)(1); Local R. 4001-2(a)(i)(B))** | The Debtors will provide the following forms of adequate protection, in each instance subject to the Carve-Out:<br><br>Adequate Protection Liens. The Debtors shall grant, in favor of the Prepetition Agent, the Adequate Protection Liens upon all prepetition and postpetition assets and property of the Debtors of any kind or nature whatsoever, now owned or hereafter acquired, and all proceeds of such proceeds, rents, products, and profits, including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of Causes of Action including the Collateral, subject and subordinate only to (y) valid, perfected and enforceable prepetition liens (if any) which are senior to the Prepetition Secured Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy code, and (z) the Carve Out. The Adequate Protection Liens shall not be (A) subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and the Debtors' estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors or (B) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise, except with respect to liens or security interests granted in connection with any Court-approved Debtor-in-Possession financing that is consented to by the Prepetition Agent.<br><br>Super-Priority Claim. The Prepetition Secured Parties shall be allowed Adequate Protection Claims, which Adequate Protection Claims shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of the Debtors' claims and Causes of Action, and any proceeds or other amounts received in respect thereof and property received thereby whether by judgment, settlement or otherwise. The Adequate Protection Claims shall be subject and subordinate only to the Carve Out and any Debtor-in-Possession financing approved by the Court and consented to in writing by the Prepetition Agent.<br><br>Fees and Expenses. As additional adequate protection for any Collateral Diminution, subject to section 506(b) of the Bankruptcy Code, the Debtors shall pay in cash: (i) the reasonable, documented professional fees and expenses (including but not limited to, the fees and disbursements of Kaye Scholer LLP, Potter Anderson & Corroon, LLP, Loughlin Meghji + Company, third party consultants, including financial consultants and auditors) payable to or incurred by the Prepetition Agent under and pursuant to the Prepetition Credit Agreement and the other Prepetition Loan Documents arising prior to the Petition Date; and (ii) on a current basis, the reasonable, documented professional fees and expenses (including but not limited to, the fees and disbursements of Kaye Scholer LLP, Potter Anderson & Corroon, LLP and Loughlin Meghji + Company) payable to or incurred by the Prepetition Agent under and pursuant to the Prepetition Credit Agreement and the other Prepetition Loan Documents arising on or subsequent to the Petition Date. The payment of the fees, expenses and | ¶¶ 7(a) - (d) |

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| | disbursements set forth in this paragraph 7(d) of the Interim Order (including professional fees and expenses of Kaye Scholer LLP, Potter Anderson & Corroon, LLP, Loughlin Meghji + Company and any other professionals or advisors retained by or on behalf of the Prepetition Agent) shall be made within the Review Period of the Invoiced Fees (subject in all respects to any applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided, however, that the Debtors, the Committee, if any, and the United States Trustee shall preserve their right to dispute the payment of any portion of the Invoiced Fees if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees; and (ii) the Debtors, the Committee, if any, or the United States Trustee files with the Court a motion or other pleading, on at least ten (10) days prior written notice to the Prepetition Agent, of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees. | |
| **Budget**<br><br>(Bankr. R. 4001(b)(1)(iii); Local R. 4001-2(a)(ii)) | Subject to paragraph 6 of the Interim Order and the other provisions of the Interim Order, the Debtors are authorized to use the Prepetition Collateral (including the Cash Collateral) of the Prepetition Secured Parties (i) in accordance with and pursuant to the terms and provisions of the Interim Order; (ii) for payment of Professional Fees, including the Carve Out; and (iii) subject to the Budget, for general corporate purposes in order to permit the orderly continuation of their businesses and (iv) to pay prepetition vendor claims of non-insiders incurred in the ordinary course up to an aggregate amount of $500,000 provided that the Prepetition Agent shall be given advance notice of the payment of any such prepetition vendor claims in accordance with this clause (iv) and the identity of any such vendor receiving payment; provided further that (a) the Prepetition Secured Parties are granted adequate protection as hereinafter set forth; (b) except on the terms and conditions of the Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral. The Debtors' right to use Cash Collateral shall terminate in accordance with paragraph 11 of the Interim Order.<br><br>The Debtors shall not (i) at any Measurement Date (as defined herein) permit cumulative CMI Operating Cash Flows (as such term is reported in the Budget to be less than the amount forecast in the Budget minus the greater of (x) twenty percent (20%) of the amount set forth in the Budget for such cumulative CMI Operating Cash Flows or (y) $350,000 (it being understood that this clause (i) shall not apply to the fees and expenses described in paragraph 7(d) below or Professional Fees), and (ii) make any payments or expenditures not expressly provided for in the Budget, including but not limited to management fee payments, without the prior written consent of the Prepetition Agent. The limitations set forth in the Interim Order shall be tested utilizing the initial Budget delivered to the Prepetition Agent pursuant to the Interim Order. Two weeks prior to the end of the last week of the Budget, the Debtors shall deliver to the Prepetition Agent an updated Budget, in form and substance satisfactory to the Prepetition Agent, which shall replace the prior Budget for purposes of measuring compliance with this paragraph 6(a). For purposes of this paragraph, the Measurement Date shall mean May 27, 2011, and every four week anniversary thereof. | ¶¶ 6(a) - (c), 7(e) |

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| | Any expenditures of Cash Collateral that are approved by any order of this Court may be made only if such expenditures are (i) permitted to be made pursuant to the Interim Order or (ii) otherwise are accounted for and covered by the Budget or (iii) for Non-Conforming Use approved with the prior written consent of the Prepetition Agent. If such written consent is given by the Prepetition Agent, the Debtors shall be authorized pursuant to the Interim Order to expend Cash Collateral for such Non-Conforming Use without further order of the Court, and the Prepetition Secured Parties shall be entitled to all of the protections set out in the Interim Order with respect to such Non-Conforming Use (giving effect to the permitted variance therefrom referred to in paragraph 6(a)(1) of the Interim Order). | |
| | The Debtors shall not make any payment, transfer of inventory or other financial support to any non-debtor subsidiaries in excess of $500,000, except (i) as expressly set forth in the Budget or (ii) with the prior written consent of the Prepetition Agent; provided, however, that any transfer of inventory or other financial support by the Debtors to any non-debtor subsidiaries as provided in the Interim Order shall be made only as an intercompany loan (containing specific provisions for repayment and other terms) and the Prepetition Agent shall receive prior written notice thereof, including without limitation, the terms of the intercompany loan. | |
| | In addition to the reporting requirements currently set forth in Section 6.1(c) of the Prepetition Credit Agreement, the Debtors agree to furnish to the Prepetition Agent in form reasonably satisfactory to the Prepetition Agent, no later than Friday of every other calendar week (commencing with respect to the week ending May 6, 2011): (i) an updated 26-Week Cash Flow Forecast (it being understood and agreed that any forecasts contained in each updated 26-Week Cash Flow Forecast are subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors and that no assurance can be given that such forecasts will be realized, and that the updated 26-Week Cash Flow Forecast is not a guarantee of financial performance and actual results may differ from the updated 26-Week Cash Flow Forecast and such differences may be material) and (ii) the Budget Reconciliation report, with each Budget Reconciliation report and updated 26-Week Cash Flow Forecast due one week after the conclusion of the two-week period. | |
| **Limited Reservation of Rights as to Contested Cash Collateral**<br><br>**(Bankr. R. 4001(b)(1)(iii); Local R. 4001-2(a)(ii))** | None | n/a |

| Material Terms | Summary of Material Terms | Paragraph of Interim Order |
|---|---|---|
| **Investigation Period**<br><br>(Bankr. R. 4001(b)(1)(iii);<br>Local R. 4001-2(a)(ii)) | The Debtors' admissions, stipulations, agreements and releases contained in the Interim Order including, without limitation, those contained in paragraph 4 of the Interim Order shall be binding upon all other parties in interest, including, without limitation, any Committee, under all circumstances and for all purposes unless (a) any Committee or another party in interest (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) having requisite standing has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained in paragraph 14 of the Interim Order) by no later than a date that is the later of (i) in the case of a party in interest with requisite standing other than any Committee, seventy-five (75) days after the date of entry of the Interim Order, (ii) in the case of any Committee, sixty (60) days after the appointment of such Committee, (iii) any such later date agreed to in writing by the Prepetition Agent, in its sole discretion and (iv) any such later date ordered by the Court for cause shown after notice and an opportunity to be heard, <u>provided</u> that such order is entered by the Court before the termination of any applicable period as set forth in paragraph 13(a)(i)(ii) or (iii) of the Interim Order, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Indebtedness or the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral, or (B) otherwise asserting any defenses, claims, causes of action, counterclaims or offsets against the Prepetition Agent or any of the other Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors on behalf of the Debtors' estates, and (b) a court of competent jurisdiction rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter. | ¶ 13 |
| **Release of Claims**<br><br>(Bankr. R. 4001(b)(1)(iii);<br>Local R. 4001-2(a)(ii)) | Each Debtor forever waives and releases any and all Claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against the Prepetition Agent and each of the other Prepetition Secured Parties, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law | ¶ 4(iii) |
| **Duration of Use of Cash Collateral**<br><br>(Bankr. R. 4001(b)(1)(iii);<br>Local R. 4001-2(a)(ii)) | Notwithstanding anything expressly contained in the Interim Order, the Debtors' use of Cash Collateral shall cease and expire pursuant to the Interim Order (subject to any applicable notice requirements set forth below) upon the earliest to occur of (a) the effective date or consummation date of any plan of reorganization, if any, confirmed in the Cases; or (b) a Termination Event. | ¶ 11 |

39.     The Debtors have an immediate postpetition need for the use of Cash Collateral.

Specifically, subject to the terms of the Interim Order, the Debtors seek to make any payments

necessary to support their non-Debtor subsidiaries.  In addition, the Debtors seek to pay in the

ordinary course of business any general unsecured claims as they become due. Such general unsecured claims represent obligations the Debtors incurred to unsecured creditors who provide legal, financial, and other services that support the Debtors' continued operation. Without ready access to Cash Collateral, such parties would not be paid, and the Debtors' business would be negatively impacted. Recognizing the Debtors' need for cash and the negative consequences that would result without access to cash, the Agent expressly consented to the Debtors' use of Cash Collateral for these purposes pursuant to the Interim Order.

40. Furthermore, the Debtors have satisfied their burden of showing that Senior Secured Prepetition Lenders' interest in Cash Collateral is adequately protected, by providing, among other terms, the following:

    a. First, the Agent (for itself and for the benefit of the Senior Secured Prepetition Lenders) will receive valid, perfected replacement security interests in and liens upon all prepetition and postpetition assets and property of the Debtors of any kind or nature whatsoever, now owned or hereafter acquired, and all proceeds of such proceeds, rents, products, and profits, including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of Causes of Action (as defined in the Interim Order) including the Collateral (as defined in the Interim Order), subject and subordinate only to (y) valid, perfected and enforceable prepetition liens (if any) which are senior to the Senior Secured Prepetition Lenders' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (z) the Carve-Out (as defined in the Interim Order).

    b. Second, the Debtors will provide the reporting set forth in Paragraph 7(e) of the Interim Order.

41. Considered in the context of the Debtors' current and projected cash position, the proposed adequate protection assures that the filing of these chapter 11 cases does not harm the position of the Agent or the Senior Secured Prepetition Lenders.

42. Finally, the Debtors' ability to finance their operations and the availability to the

24

Debtors of sufficient working capital and liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the going-concern value and other values of the Debtors' estates. The Debtors, therefore, seek immediate authority to use the Cash Collateral as set forth in the Motion and in the Interim Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(c).

43.     In light of the foregoing, I believe that the relief requested in the Cash Collateral Motion (a) satisfies the requirements of Bankruptcy Rules 4001 and 6003 to support an expedited preliminary hearing and immediate Cash Collateral availability, (b) is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and (c) will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Cash Collateral Motion.

    **C.**    **Motion of Caribe Media, Inc., et al., for the Entry of an Order Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto and (C) Maintain Existing Business Forms (the "Cash Management Motion")**

44.     By the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to: (a) continue to operate the Cash Management System (as defined below); (b) honor certain *de minimis* prepetition obligations related thereto, including ordinary course Bank Fees (as defined in the Cash Management Motion), in an amount not to exceed $1,000; and (c) maintain existing business forms.

45.     In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to: (a) collect, transfer and disburse funds; (b) facilitate cash monitoring, forecasting and reporting; and (c) enable the Debtors to maintain control over their bank accounts (collectively, the "Bank Accounts") located at U.S.

25

Bank, N.A. ("U.S. Bank").[9]

46. The Cash Management System consists of two Bank Accounts and is used to receive incoming payments, deposit checks and remit disbursements in the ordinary course of the Debtors' businesses. The Debtors disburse funds maintained in the Cash Management System through either traditional written checks or wire transfers. The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors' economic scope and geographic reach, which use such systems because of their numerous benefits, including, the ability to (a) quickly create status reports that contain the location and amount of funds, thereby allowing management to track and control such funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds. These controls are particularly important given that, on a monthly basis, a total of approximately $1,500,000 flows through the Debtors' integrated Cash Management System to service the Debtors' operations.

## 1.    The Bank Accounts

47. CMI maintains a concentration bank account (the "Concentration Account") at U.S. Bank. The Concentration Account serves as a repository by providing the primary repository for the Debtors' cash from which they fund their Disbursement Account (as defined herein). The purpose of the Concentration Account is, among other things, to receive funds paid by Axesa for use of certain of CMI's publication rights and receive dividends from CSID. To date, for fiscal year 2011, the Concentration Account has held an average balance of approximately $2.5 million.

---

9    As of the Petition Date, the Bank Accounts are located at U.S. Bank, which is designated as an authorized depository by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") in accordance with the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines" or "Guidelines").

48. CMI also maintains a disbursement account at U.S. Bank (the "Disbursement Account"). The Disbursement Account is used for the Debtors' check and wire payments and typically maintains a zero balance. On an as-needed basis, the Disbursement Account is automatically funded by the Concentration Account in an amount equal the total value of checks and wires presented for payment from the Disbursement Account in a given business day.

### 2. The Debtors' Existing Business Forms and Checks

49. In the ordinary course of business, the Debtors may use checks and other business forms. To minimize expenses incurred by their estates, the Debtors seek to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. This will allow the Debtors to avoid incurring the expense and delay of ordering entirely new business forms and check stock. The Debtors will acquire new stock stamped with "Debtor in Possession" after their current stock of forms and checks is depleted.

50. In light of the foregoing, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Cash Management Motion.

### D. Motion of Caribe Media, Inc., et al., for the Entry of an Order Authorizing the Debtors to Remit Certain Prepetition Taxes and Fees (the "Taxes Motion")

51. By the Taxes Motion, the Debtors seek the authority to remit these taxes and fees, as well as any taxes and related fees that become due, without regard to whether such obligations accrued before or after the Petition Date.

27

52.     In the ordinary course of business, the Debtors (a) incur and/or collect taxes and government charges, including business volume taxes, corporate income taxes, corporate annual report fees and personal property taxes, in the operation of their businesses (collectively, the "Taxes"), and (b) related fees and other similar assessments (collectively, the "Fees"). The Debtors remit the Taxes and Fees to four taxing authorities (collectively, the "Authorities") in the ordinary course of business in accordance with all applicable laws and regulations. As of the Petition Date, the Debtors believe that they have timely filed, or sought extensions of time to file, all applicable returns for Taxes.

53.     The Debtors estimate that the total amount of prepetition Taxes and Fees accrued through the Petition Date is approximately $100,000. The Debtors believe that a majority of these outstanding liabilities constitute "trust fund" taxes and fees that the Debtors have collected and hold in trust for the benefit of the applicable Authority. The Debtors believe that such funds do not constitute property of their estates and could not otherwise be used by the Debtors.

54.     In addition, if the Taxes and Fees are not paid, some, if not all, of the Authorities may cause the Debtors to be audited, which would unnecessarily divert the attention of the Debtors' management and personnel from their reorganization efforts. The Authorities may also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that could harm the Debtors, their creditors and other parties in interest in the event that the Debtors do not remit the Taxes and Fees on a timely basis. Based on the foregoing, failure to remit the Taxes and Fees could have a material adverse impact on the Debtors' ability to continue operating their businesses and make a smooth transition into chapter 11.

DOCS_DE:169744.1

### 1.    Business Volume Taxes

55.    In the ordinary course of business, CMI incurs and remits business volume taxes (the "Business Volume Taxes"), which are similar to gross receipts taxes, to the San Juan Municipal Department.    Although CMI believes that it is current with respect to payment of its Business Volume Taxes, it estimates that approximately $95,000 in Business Volume Taxes has accrued and remains unpaid as of the Petition Date.    Accordingly, the Debtors seek the authority to pay these prepetition Business Volume Taxes when they become due.[10]

### 2.    Corporation Income Taxes

56.    In the ordinary course of business, CMI incurs and remits corporation income taxes (the "Corporation Income Taxes") to the Commonwealth of Puerto Rico, Department of Treasury.    As of the Petition Date, CMI does not believe that it has incurred any prepetition Corporation Income Taxes that remain unpaid.    However, out of an abundance of caution, the Debtors seek the authority to remit any Corporation Income Taxes that CMI may have incurred prior to the Petition Date should such taxes become due and owing postpetition.    Such payments, if necessary, will not cause the Debtors to exceed the $100,000 in aggregate relief they seek pursuant to this Motion.

### 3.    Personal Property Taxes

57.    In the ordinary course of business, CMI incurs and remits personal property taxes (the "Personal Property Taxes") to the Commonwealth of Puerto Rico, Municipal Revenue Collection Center.    As of the Petition Date, CMI does not believe that it has incurred any

---

[10]    The prepetition Business Volume Taxes is an estimate based upon CMI's annual financial statements.    The audit of such financial statements has not yet been completed.    Once such audit process is complete, there is a possibility that CMI will owe more than $95,000 in prepetition Business Volume Taxes.    Accordingly, the Debtors reserve their rights to seek additional relief with respect to prepetition Business Volume Taxes once CMI's annual financial statements have completed the audit process.

prepetition Personal Property Taxes that remain unpaid. However, out of an abundance of caution, the Debtors seek the authority to remit any Personal Property Taxes that CMI may have incurred prior to the Petition Date should such taxes become due and owing postpetition. Such payments, if necessary, will not cause the Debtors to exceed the $100,000 in aggregate relief they seek pursuant to this Motion.

### 4. Corporate Annual Report Fees

58. In the ordinary course of business, the Debtors incur and remit corporate annual report fees (the "Corporate Annual Report Fees") to the Government of Puerto Rico, Department of State. Although CMI believes that it is current with respect to payment of its Corporate Annual Report Fees, it estimates that a *de minimis* amount of Corporate Annual Report Fees has accrued and remains unpaid as of the Petition Date. Accordingly, the Debtors seek the authority to satisfy these prepetition Business Volume Taxes when they become due.

59. In light of the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Taxes Motion.

### E. Motion of Caribe Media, Inc., et al., for the Entry of an Order Authorizing the Debtors to Pay All Prepetition General Unsecured Creditors (the "General Unsecured Claims Motion")

60. By the General Unsecured Claims Motion, the Debtors seek entry of an order authorizing the Debtors to pay the General Unsecured Claims (as defined herein) in an amount not to exceed $500,000 in the aggregate without further order of this Court. Additionally, the Debtors reserve the right to require better terms, or the reinstatement or continuance of terms,

from those holders of General Unsecured Claims that do not have contracts with the Debtors or are otherwise free to change their terms or have changed their terms. The Debtors seek such relief with the support of the Agent and the Senior Subordinated Noteholder.

61. The Debtors incur obligations (the "General Unsecured Claims") to certain unsecured creditors (the "General Unsecured Creditors") who provide legal, financial and other services that support the continued operation of the Debtors' businesses.[11] By authorizing the Debtors to satisfy the General Unsecured Claims on the terms set forth herein, the Debtors will be able to maximize the value of their estates and provide for a smooth transition into and out of these chapter 11 cases.

62. Although the Debtors believe that, as of the Petition Date, there are no outstanding General Unsecured Claims, out of an abundance of caution, the Debtors seek the authority, in their sole discretion, to satisfy the prepetition General Unsecured Claims, in an amount not to exceed $500,000 in the aggregate. Cash maintained and generated by the Debtors will provide ample liquidity for payment of the prepetition General Unsecured Claims. The Senior Secured Prepetition Lenders and Senior Subordinated Noteholder support the requested relief.

63. In light of the foregoing, I believe that the relief requested in the General Unsecured Claims Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the General Unsecured Claims Motion.

---

[11] The General Unsecured Claims do not include claims held by the Senior Subordinated Noteholder on account of the Senior Subordinated Notes or any other claims held by the Debtors' insiders.

F.   **Application of Caribe Media, Inc. et al., for the Entry of an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Notice and Claims Agent for the Debtors and Debtors in Possession _Nunc Pro Tunc_ to the Petition Date (the "KCC Retention Application")**

64.   By the KCC Retention Application, the Debtors seek entry of an order authorizing the employment and retention of Kurtzman Carson Consultants LLC ("KCC") as the notice and claims agent in these chapter 11 cases, subject to that certain services agreement, dated April 29, 2011, by and between KCC and Caribe Media, Inc., effective _nunc pro tunc_ to the Petition Date.

65.   The creditors and other parties in interest involved in the Debtors' chapter 11 cases may impose heavy administrative and other burdens on this Court and the Office of the Clerk of the Court (the "Clerk's Office"). To relieve the Clerk's Office of these burdens, the Debtors seek an order appointing KCC as the notice and claims agent in these chapter 11 cases pursuant to both 28 U.S.C. § 156(c) and Local Bankruptcy Rules 2002-1(f) and 9013-1(m). The Debtors' selection of KCC to act as the official claims agent satisfies the Court's protocol for the retention of a notice and claims agent, where the Debtors have obtained and reviewed engagement proposals from other court-approved claims agents to ensure selection through a competitive process. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed in connection with the Local Insight Chapter 11 Cases, that KCC would provide the most cost-effective and efficient service as a claims agent for these chapter 11 cases.

66.   The Debtors anticipate that there could be hundreds of entities to be noticed in these chapter 11 cases. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of an outside claims agent is both necessary and in the best interests of the Debtors' estates, creditors and other parties in interest.

67.   In light of the foregoing, I believe that the relief requested in the KCC Retention

Application is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the KCC Retention Application.

*[Remainder of Page Intentionally Left Blank]*

DOCS_DE:169744.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 3, 2011                              Respectfully submitted,

Chris Batson
Chief Financial Officer